1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ICLEEN ENTWICKLUNGS-UND VERTRIEBSANSTALT FÜR UMWELTPRODUKTE, a Liechtenstein corporation; and IQAIR NORTH AMERICA, INC., a California corporation, <br><br>        Plaintiff, <br><br>      vs. <br><br> BLUEAIR AB, a Sweden corporation; and BLUEAIR, INC., a Delaware corporation, <br><br>        Defendant. | Case No. 2:21-cv-02236-DSF-ADSx <br><br> **DECLARATION OF SCOTT D. SWAIN** |

## I.     ASSIGNMENT AND QUALIFICATIONS

1.     My name is Dr. Scott D. Swain and I have been asked by ICLEEN ENTWICKLUNGS-UND VERTRIEBSANSTALT FÜR UMWELTPRODUKTE and IQAIR NORTH AMERICA, INC. (together hereinafter, "IQAir") to evaluate

1  Dr. David T. Neal's opinions, as outlined in his report (hereinafter, the "Neal

2  Report")[1] and the two consumer surveys ("Survey 1" and "Survey 2," respectively)

3  he conducted on behalf of BLUEAIR AB and BLUEAIR, INC. (together

4  hereinafter, "Defendants").

5       2.    I am a Professor of Marketing and a Powers Distinguished Fellow at

6  Clemson University. A copy of my curriculum vitae is attached as Exhibit A. I

7  earned an MBA and Ph.D. in Marketing from the University of South Carolina in

8  1996 and 2002, respectively. I earned a Bachelor of Science in Electrical

9  Engineering from Clemson University in 1991, and a Bachelor of Science in Physics

10  from Francis Marion University in 1991. Prior to joining Clemson University, I

11  served on the faculties of Boston University (Questrom School of Business, 2002-

12  2008) and Northeastern University (D'Amore-McKim School of Business, 2009-

13  2013). In the Spring of 2021, I served as a visiting faculty in the Tuck School of

14  Business at Dartmouth College.

15       3.    My fields of expertise include consumer behavior, branding,

16  advertising strategy, retailing, promotions, pricing, research methodology, and

17  marketing management. My peer-reviewed research has been published in the most

18  respected journals in the disciplines of marketing, management, information

19  systems, and behavioral economics, including the *Journal of Marketing*, *Journal of*

20  *Marketing Research*, *Journal of Consumer Research*, *Journal of the Academy of*

21  *Marketing Science*, *Journal of Retailing*, *Decision Support Systems*, *Journal of*

22  *Behavioral and Experimental Economics*, *Journal of Business Research*, *Marketing*

23  *Letters*, *Journal of Marketing Theory and Practice,* and the *Journal of Marketing*

24  *Analytics*. I have also published numerous scholarly book chapters, trade articles,

25  and peer-reviewed articles, abstracts, and posters in international conference

26  proceedings. I am a current member of several editorial review boards for leading

27  _____

28  [1] Expert report of Dr. David T. Neal, August 23, 2021.

journals and frequently serve as a referee for research manuscripts at leading journals in retailing, marketing, consumer psychology, international marketing, management, organizational behavior, information science, operations research, and applied psychology. The journals, conference proceedings, and scholarly texts in which I publish, serve on editorial review boards, and referee manuscripts require me to maintain a high level of expertise in marketing and consumer behavior theory and in methodologies such as experimental design, survey design, multivariate analysis, choice modeling, optimization, and structural equation modeling.

4.     Over the past 20 years, I have taught doctoral courses in marketing management, MBA courses in marketing research, advertising strategy, and entrepreneurial marketing, and undergraduate courses in marketing research, advertising, branding, product management, marketing strategy, and marketing principles. For over 15 years, my marketing research courses have required students to conduct full-scale conjoint projects, including developing theoretical and managerial justifications, designing experiments, scripting surveys, programming and hosting surveys, collecting primary data, analyzing utilities, building and using market simulators, and communicating results to stakeholders. In total, I have overseen more than 450 such conjoint projects. I have also supervised and guided numerous theses and dissertations on topics related to my areas of expertise. I have been recognized for excellence in teaching at multiple institutions and have been invited to speak at international conferences about my teaching methods and pedagogy.

5.     I have conducted, supervised, and assessed nearly 1,000 research studies that have marketing applications. Most of these studies use qualitative and quantitative methods to understand the perceptions, attitudes, decision-making, and behaviors of customers, managers, and frontline personnel with respect to marketing stimuli such as promotions, pricing, advertising, technology, public relations, packaging, product design, retail environments, services, and channels of

distribution. In addition, I have worked as a research and marketing strategy consultant to companies and other organizations to provide data and insights related to their marketing activities and processes in contexts such as advertising assessment systems, customer segmentation, product design, service design, retail design, technology user experiences, customer journeys, and lifetime value (customer equity). My work with companies and other organizations has frequently involved designing, conducting, and reporting the results of customer surveys.

6.      Based on my education, experience, and expertise in assessing consumer perceptions and marketing activities, I have been previously retained and qualified as an expert witness in federal and adversarial proceedings, including the National Advertising Division. A list of my testimony in federal cases in the previous four years is attached as Exhibit B. I am being compensated for my time in this matter at a rate of $600 per hour. This compensation is not in any way contingent on the content of my opinions or the outcomes of the matter.

7.      Documents and materials I reviewed in connection with the preparation of this report are listed in Exhibit C. In forming my opinions, I relied on the aforementioned documents materials, existing published research and scholarly treatises on survey design (cited in the enclosed report), and existing published research on the principles of consumer behavior, information processing, and decision making (cited in the enclosed report).

8.      My opinions are held to a reasonable degree of professional certainty and the information on which I relied consists of the type of information that is typically relied upon in my fields of expertise. I reserve the right to supplement this report if additional information becomes available that would cause me to amend or supplement my opinions in this matter. To the extent that I have not responded to any fact or allegation contained in Defendants' papers in this reply declaration, it should not be interpreted as my or IQAir's agreement to such fact or allegation.

9.      For example, it is my understanding that counsel for Defendants refused to provide IQAir's counsel with a copy of Dr. Neal's raw data files for Survey 1 and Survey 2. As such, the only representation of Dr. Neal's data is 941 separate pages of printed numbers and text in the Neal Report, and it is not clear or verifiable whether the printed data has a one-to-one correspondence with the raw data files. To mention but one concern, there are certain columns that I would expect to observe (but did not) if the survey were programmed and fielded by a panel company in the manner described in the Neal Report.

10.     In my experience, it is highly unusual for opposing counsel to refuse to disclose any raw data files for a survey, especially when the opposition's survey expert(s) have relied upon such raw data files to perform analysis that serve as the basis for expert opinions.

11.     Further, the Neal Report contains no screenshots of Survey 1 or Survey 2, thereby raising questions as to whether the surveys were programmed as intended. It also raises questions as to what respondents saw and experienced when completing Survey 1 and Survey 2. Such information is critical for evaluating a number of design issues that are relevant to determining survey reliability.

## II.     BACKGROUND AND SUMMARY OF CONCLUSIONS

12.     According to the Neal Report, Dr. Neal, "…designed and executed two likelihood of confusion surveys… to identify and quantify any likelihood of confusion stemming from Defendants' use of the HEALTHPROTECT name in connection with air purifiers/air filters,"[2] specifically, "Survey 1 used the well-established Eveready format and Survey 2 used the well-established Squirt format."[3] The final sample size for Survey 1 was 320 and the final sample size for Survey 2 was 204.

---

[2] Neal Report, ¶ 1.8.

[3] Neal Report, ¶ 1.9.

13.     Time stamps in the Neal Report[4] indicate that Survey 1 ran each day from August 14-17, while Survey 2 ran each day from August 16-18. Examination of individual respondent time stamps indicates that 94.4% (302/320) of the non-excluded respondents for Survey 1 were surveyed prior to commencement of Survey 2 (August 16 at 19:35). Additionally, Survey 1 data collection was "paused" at this point (August 16 at 05:36) for 26 hours and 43 minutes (resuming on August 17 at 08:19).

14.     Based on the results of his Survey 1 and Survey 2, Dr. Neal offers the following conclusion:

> It is my considered scientific opinion that the results of the two surveys I conducted clearly establish that Defendants' use of the HEALTHPROTECT name in connection with air purifiers/air filters does not cause any material likelihood of confusion with IQAir. That conclusion holds true both in marketplace contexts where IQAir's and Defendants' marks (a) are not proximate in the marketplace (Survey 1, Eveready format), and (b) are proximate in the marketplace (Survey 2, Squirt format).[5]

15.     While it is well-recognized that an adequate survey can provide relevant, reliable information, it is also well-established that certain biases and flaws in survey methodology can lead to inaccurate "evidence" regarding consumers' states of mind.[6] Common issues that must be considered when evaluating the reliability of a survey include, but are not limited to, the sampled universe, survey design/procedures, selection of stimuli, question wording, layouts, and methods of analysis. Complex scientific surveys conducted for purposes similar to that of Dr.

---

[4] Neal Report, ¶ Exhibit C-1 and Exhibit C-2.

[5] Neal Report, ¶ 2.1.

[6] For example, see Baker et al. (2004); Bradburn et al. (2004); Diamond (2011); Marsden and Wright (2010), Tourangeau et al. (2000).

Neal's surveys must be designed and administered based on methodologies that are relied upon in the relevant fields of expertise and according to well-established survey standards.

16.     Accordingly, in this report I provide a detailed evaluation of Dr. Neal's two surveys. As part of this evaluation, I analyze: (i) whether the surveys offer reliable data about consumers' likelihood of confusion in this matter, and (ii) whether the survey data can substantiate Dr. Neal's conclusions and Defendants' position in this matter.

17.     As discussed in greater detail later, I find that Dr. Neal's surveys violated multiple principles and requirements of scientific surveys. These violations render Dr. Neal's reported results invalid and irrelevant for substantiating his conclusions regarding consumers' likelihood of confusion. Specifically,

- Dr. Neal's universe suffers from multiple fatal flaws.
  - o Dr. Neal failed to properly specify the relevant demographics.
  - o Dr. Neal failed to screen for yea-saying in past purchases and future purchase intentions.
  - o Dr. Neal failed to exclude consumers who are not in the market.
  - o Dr. Neal failed to exclude professional survey takers.
  - o Dr. Neal failed to exclude non-compliant respondents.
- Dr. Neal's Survey 1 (Eveready) does not measure likelihood of confusion.
  - o The Eveready format is inappropriate for the present matter.
  - o Dr. Neal's results empirically confirm that Eveready is inappropriate for the present matter.
- Dr. Neal's Survey 2 (Squirt) uses inappropriate control(s).
  - o Dr. Neal failed to justify his simulation of competitive proximity or his selection of controls.
  - o Dr. Neal's controls fail to isolate the effect of the disputed mark.

- o Dr. Neal's decision to use the control with the highest confusion level is arbitrary and specious.
- o Confusion for Dr. Neal's preferred control in Survey 2 is inflated and detracts from actionable net confusion.

## III.  DR. NEAL'S UNIVERSE SUFFERS FROM MULTIPLE FATAL FLAWS

18.     As stated in the Neal Report, "…the initial screening criteria were identical in Surveys 1 and 2."[7] Specifically, questions Q1-Q13 were identical, meaning that the sampled universe for the two surveys is the same. Thus, the flaws in these questions undermine the Survey 1 and Survey 2 universes in equal measure.

### A.  <u>Failure to Properly Specify Demographics</u>

19.     Contrary to standard scientific methodology, the Neal Report provides no indication that any attempt was made to understand, much less match, the demographics of the relevant universe of consumers when collecting data for Survey 1 or Survey 2. Rather, the Neal Report admits that "The panel companies used in both surveys (Prodege in Survey 1, DISQO in Survey 2) were instructed to send survey invitations using the "click-balancing method" in which survey starts are matched to National Census data with respect to gender, age, and Census region."

20.     In other words, Dr. Neal left the demographic distributions to "fall as they may" during the process of screening for actual and potential purchasers of air purifiers. This approach does nothing to ensure demographic distributions in the final sample since respondents in different demographics may be more or less likely to finish or qualify for a survey.

21.     For example, according to Dr. Punam Keller's declaration in this matter,[8] "When compared to males, evidence suggests that females are more

---

[7] Neal Report, ¶ 3.10.

[8] Declaration of Professor Punam Keller, ¶ 22.

involved and interested in the content of health messages, especially health directed towards children, and have a better vocabulary, and are generally more skeptical or savvier consumers of advertising. Such relationships indicate that Blueair's target consumer, moms concerned with their kids' health, would be more likely than other consumers to perceive a difference between the IQAir "HealthPro" and Blueair "HealthProtect" trademarks." Thus, one would expect Dr. Neal to consider and ensure that his Survey 1 and Survey 2 respondents are predominantly mothers, or at least female. In contrast, Dr. Neal's respondents are 65.3% male ((188 + 154)/(320 + 204)), with unknown parenting status.

22.    In fact, Dr. Neal's sampling approach is not even internally consistent. Specifically, despite sharing identical screening questions, Dr. Neal's Survey 1 and Survey 2 display demographic discrepancies. For example, whereas 41.3% of Survey 1 respondents report being female in question Q1, only 24.5% of Survey 2 respondents do the same. Similarly, twice as many Survey 1 respondents are aged 65 years old or older (7.8%) in question Q3 compared to Survey 2 respondents (3.9%). Discrepancies also exist in the purchase screener questions. For example, whereas only 59.3% of Survey 1 respondents indicate being likely to purchase a vacuum cleaner in the next two years in Q10, the figure for Survey 2 respondents is 73.8%.

23.    Regardless of whether these discrepancies reflect uncontrolled complete rates across demographic categories or differences in the two panel company pools, there are only two possible conclusions: either one survey sample is less representative of the relevant universe than the other, or both surveys are unrepresentative of the relevant universe.

**B.**    **Failure to Screen for Yea-saying in Past Purchases and Future Purchase Intentions**

24.    Neither Survey 1 nor Survey 2 is designed to protect against yea-saying, survey-gaming, or overstated intentions in the purchase screener sequence

(Q9, Q10, Q11, and Q12). Thus, both survey samples are likely to include a substantial number of respondents who are not members of the relevant universe.

25.     The first two questions in the purchase screener sequence (Q9 and Q10) ask respondents whether they have purchased any of four different "electronic devices" for themselves or someone else in the last two years (Q9) or if they are likely to do so in the next two years (Q10). As is well-known to survey researchers, "check all that apply" questions can be particularly susceptible to yea-saying. Respondents also have a motivation to "game" the process by checking numerous boxes, since doing so improves their chances of checking the "correct" box(es) to avoid termination and remain eligible to receive compensation.

26.     Further, Q10 is a question about a hypothetical future purchase intention. Much research indicates that actual behaviors can differ substantially and systematically from intentions expressed in a survey (sometimes referred to as "hypothetical bias"). For example, Chandon et al. (2005) counsel that, "... it is well known that consumers' self-reported purchase intentions do not perfectly predict their future purchase behavior, nor do these differences cancel each other out when intentions and behavior are aggregated across consumers."[9] Similarly, Hoyer and MacInnis (2010) explain in their popular consumer behavior textbook that, "... what we intend to do does not always predict what we will actually do."[10]

27.     With respect to respondents' stated purchase or patronage intentions, it is well-understood by researchers and practitioners that respondents' estimates tend to be grossly inflated. This can be due to a confluence of factors that all encourage inflation including demand effects (e.g., respondents assume marketers want to hear that a tested product is desirable), optimism, and a tendency to think about likely opportunities to engaging in the behavior but not likely impediments to engaging in

---

[9] Chandon et al (2005). See also Kalwani and Silk (1982).

[10] Hoyer and MacInnis (2010).

the behavior. In fact, when forecasting consumer behavior, researchers have learned that they must apply heavy discounting factors to respondents' stated intentions to yield more accurate predictions of future behavior.[11] For example, the well-known marketing research firm, Nielson, developed forecasting models to account for the gap when forecasting intentions to behaviors for various product categories with proprietary discounting factors. These models have been used in practice for many years and were developed into a case study by the Harvard Business School and have been taught worldwide to business school students and executives for over 25 years.[12]

28.     In anticipation of respondents' inflated reports of past and future purchases, researchers may often include decoy, contradictory, or rare options to use as screening devices. Dr. Neal failed to include any such safety check. Respondents in Dr. Neal's surveys faced no hurdles or monitoring and instead were free to select as many boxes as they wished without repercussion.

29.     Notably, though Dr. Neal employed a "quality assurance" question (Q6) prior to Q9 and Q10, the quality check pertained to respondent inattentiveness to instructions and not to systematic response behaviors such as yea-saying, survey-gaming, or intention inflation (each of which is preconditioned on instructions).

> Q9.
>
> Thinking about the last 2 years, which of the following electronic devices, if any, have you personally purchased for yourself or for someone else? Please check all that apply.
>
> **[MULTI-SELECT; RANDOMIZE EXCEPT ANCHORED]**
>
> 1. An LED TV
>
> 2. A vacuum cleaner

---

[11] Lee et al. (2014). Manski (1990).

[12] Rangan and Bell (1994).

DECLARATION OF SCOTT D. SWAIN

3. An air purifier

4. A treadmill

5. None of the above/I don't recall **[ANCHOR,EXCLUSIVE]**

Q10.

And now thinking about the next 2 years, which of the following electronic devices, if any, are you likely to personally purchase for yourself or for someone else? Please check all that apply.

**[MULTI-SELECT; RANDOMIZE EXCEPT ANCHORED]**

1. An LED TV

2. A vacuum cleaner

3. An air purifier

4. A treadmill

5. None of the above/no opinion **[ANCHOR,EXCLUSIVE]**

30.     To understand the potential impact of yea-saying and/or gaming in Q9 and Q10 without the benefit of preventative or corrective measures in Dr. Neal's design, one can consider that for each of the products in the Q9 list (LED TVs, vacuum cleaners, treadmills, and air purifiers), there exists a real U.S. household purchase rate. For example, in 2018, Consumer Reports estimated from industry data that approximately 1 in 4 (25.0%) of U.S. homes own an air purifier.[13] As air purifiers are durable, it is reasonable to assume that only a fraction of this ownership would be due to purchases within the last two years. Additionally, we may understand that some of these relevant consumers would have paid $599 or more for an air purifier. By knowing how many respondents saw and completed Q9 as well as how many respondents were subsequently terminated, we could compute the

_____

[13] https://www.consumerreports.org/air-purifiers/air-purifiers-and-the-cost-of-clean-air-a6152505326/

-12-

reported rate of purchasing in the past two years to estimates of this rate based on real-world data. However, for unknown reasons, the Neal Report does not provide termination counts for Q9 (or Q10),[14] despite providing termination counts for other screening questions. As described below, this omission effectively obscures yea-saying at the product level.

31.     A simple example illustrates the issue. Assume that, in the last two years, 50% of U.S. households purchased an LED TV, 30% purchased a vacuum cleaner, 20% purchased a treadmill, and 20% purchased an air purifier (with 10% paying $599 or more). Assume also that purchases across the product categories are relatively independent. In this scenario, the probability of a respondent being qualified to check all four boxes in Q9 is 0.006 (0.06%). The probability of respondents going on to qualify in Q11 (i.e., paying $599 or more for an air purifier) is 0.0006 (0.006%).

32.     In Dr. Neal's Survey 1, a total of 22.8% of respondents checked every box in Q9, while 40.0% checked every box in Q10. Similarly, in Dr. Neal's Survey 2, a total of 27.9% of respondents checked every box in Q9, while 32.4% checked every box in Q10. Though the conditions for significant levels of yea-saying and gaming are present in Q9 and Q10, it is difficult to specify the full extent of the problem without disclosure of Dr. Neal's raw data files or (complete) termination reports.

**C.     Failure to Exclude Consumers Who are not in the Market**

33.     Both Survey 1 and Survey 2 failed to terminate respondents who did not select "An air purifier" in Q10. This violates a key requirement of the Eveready format, which is that it should be conducted among Defendants' prospective customers, as they are likely to encounter Defendants' use in the market. This requirement reflects the measurement logic of the Eveready format, which is

---

[14] Neal Report, ¶ Exhibit D-1 and Exhibit D-2.

whether Defendants' marketplace use will likely activate consumer recall of IQAir's use, assuming as a foundational premise that IQAir's use of its mark is sufficiently close to the surface of purchasers' memory to generate such recall. Respondents in Dr. Neal's Survey 1 and Survey 2 who did not select "An air purifier" in Q10 should be excluded, as they have admitted that they are not in the market for an air purifier. These non-members of the relevant universe account for a total of 18.9% of Dr. Neal's respondents, including 16.6% of the 320 respondents in Survey 1 and 22.5% of the 204 respondents in Survey 2.

34.    The second two questions in the purchase screener sequence (Q11 and Q12) ask respondents what price they paid for air purifier in the last two years (Q11) and/or what price they would willing to pay for an air purifier in the next two years (Q12). Whereas many, if not most, air purifier offerings are priced below $300 (see Exhibit D), the lowest price mentioned in Q11 and Q12 is $300. This sends a clear signal to respondents that the researcher is interested in purchasers of higher-priced air purifiers and that the only way to remain qualified for the survey is to select either the "$300-598" or the "$599 or more" response options. Though the Neal Report indicates a number of terminations at various points in the screener sections of Survey 1 and Survey 2,[15] there is no indication of how many respondents transited from Q9 and/or Q10.

[IF "AIR PURIFIER" SELECTED AT Q9, ASK Q11. IF NOT, SKIP] Q11.

You indicated that you have purchased an air purifier within the last 2 years. If you recall, what did the air purifier cost?

[SINGLE SELECT; DON'T RANDOMIZE]

1. Less than $300

2. $300-$598

---

[15] Neal Report, ¶ Exhibit D-1 and Exhibit D-2.

DECLARATION OF SCOTT D. SWAIN

3. $599 or more

4. I don't recall

[IF "AIR PURIFIER" SELECTED AT Q10, ASK Q12. IF NOT, SKIP]

Q12.

You indicated that you are likely to purchase an air purifier within the next 2 years. If you have an opinion, what are you likely to spend to purchase that air purifier?

[SINGLE SELECT; DON'T RANDOMIZE]

1. Less than $300

2. $300-$598

3. $599 or more

4. I don't know

### D.   Failure to Exclude Professional Survey Takers

35.   It is standard practice in litigation-related surveys to exclude respondents who have recently participated in other surveys (especially other surveys pertaining to the same product category). Such respondents may be acting as "professional survey takers" or may be inappropriately sensitized to the topic of the survey. This concern has heightened in recent years, as panel companies continue to consolidate and share access to the same pool of respondents and as researchers and experts gravitate to the same, relatively small number of reliable pools. Based on the Neal Report, it does not appear that Dr. Neal made any effort to exclude respondents who may have recently completed surveys on the topic of air care or air purifier devices.

### E.   Failure to Exclude Non-Compliant Respondents

36.   Standard survey practices involves, among other things, instructing respondents to pay attention and to avoid guessing. Additionally, researchers may include questions designed to identify and filter out such respondents. However, non-compliant respondents sometimes manage to pass through screener questions

DECLARATION OF SCOTT D. SWAIN

and other checks. Designs that include open-end questions (such as the Eveready format) offer additional opportunities to identify non-compliant respondents because providing sensible open-end responses (verbatims) typically requires greater attention and cognitive resources than non-compliant respondents are willing to provide.

37.     In Survey 1, Dr. Neal excluded three respondents for providing "nonsense" verbatims (e.g., "sjshh" and "cddsgghg was the only player is"). However, there were at least 13 non-excluded other respondents who provided the same sort of non-sense responses or who admitted that they were merely guessing when providing names. Similarly, at least 14 respondents in Survey 2 were non-compliant yet were not excluded.

## IV.     DR. NEAL'S SURVEY 1 FORMAT (EVEREADY) IS INAPPROPRIATE FOR THE PRESENT MATTER

38.     Dr. Neal admits that, "In general, the Eveready format is the preferred method to test confusion in contexts where the senior and junior users are not proximate in the marketplace (e.g., are sold via different websites). In contrast, the Squirt format is generally preferred in contexts where the senior and junior users are proximate in the marketplace (e.g., are sold side-by-side in a store)."[16]

39.     When explaining his decision to conduct both an Eveready study (Survey 1) and Squirt study (Survey 2), Dr. Neal goes on to say, "Based on information currently known to me, I do not take any position as to whether, and in what contexts, the senior and junior user in this matter are proximate or not proximate in the marketplace. Instead, I designed two surveys—one using each of the two formats—to address any scenarios where the marks are not deemed

---

[16] Neal Report, ¶ 1.9.

proximate (Survey 1, Eveready format) and any scenarios where they are deemed proximate (Survey 2, Squirt format)."[17]

40.     Though marketplace or competitive proximity has a place in discussing whether to use the Eveready or Squirt survey format (or neither), the articles Dr. Neal cites as foundational for his survey designs clearly articulate that the primary consideration for the Eveready survey format is whether the senior user's brand is readily accessible or "top of mind" among consumers in the relevant universe.

41.     In a 2016 article cited by Dr. Neal, Dr. Jerre B. Swann assert that, "For marks that are not readily accessible in memory, an Eveready may substantially underestimate the likelihood of real world confusion."[18] In a later article, also cited by Dr. Neal, Dr. Swann instructs that an Eveready survey, "…produces evidence supporting an inference as to a likelihood of confusion only where the senior mark is sufficiently available in memory to be triggered by a similar junior mark."[19] Most recently, Drs. Bruce Isaacson and Keith A. Botner reviewed relevant literature and conducted empirical research on the use of the Eveready format, concluding that, "…using an Eveready survey for a mark that is not readily available in the memory of consumers may underestimate confusion."

42.     Thus, (lack of) commercial or marketplace proximity is an insufficient basis for Dr. Neal to decide whether or when his use of the Eveready format in Survey 1 is relevant to the current matter. What Dr. Neal should have also considered is whether IQAir's mark is likely to be top-of-mind, because this is the key requirement for using the Eveready format, even in scenarios where IQAir's and

---

[17] Neal Report, ¶ 1.10.

[18] Swann (2016)

[19] Swann (2019)

DECLARATION OF SCOTT D. SWAIN

Defendants' marks are not deemed to have competitive or marketplace proximity (which I understand is not the case here).

43.     On the surface, the Eveready format may seem appropriate in some contexts for the present matter, given that IQAir's mark may be considered commercially strong and recognizable among the relevant universe of consumers. However, as explained by Dr. Swann,[20] in an article cited by Dr. Neal, this is a hasty conclusion. In some cases, commercial strength does imply top-of-mind status, such as strong marks for products that consumers find involving, expressive, and frequently needed (e.g., active wear or cosmetics). Strong marks for these kinds of products facilitate easy, top-down, brand-driven decisions as opposed to effortful, bottom-up, attribute-driven decisions.

44.     A contrasting scenario pertains to commercially strong marks for products that Dr. Swann describes as "…rarely purchased, expensive niche items, as to which a consumer will likely canvas the market before making a purchase (e.g., stainless steel grills)…"[21] These products are often not retained top-of-mind by consumers due to infrequent purchase repetition and the sufficiency of being able to recognize the desired mark when product search commences.  Because consumers have no need or motivation to store these marks. they do not remain readily accessible in buyer memory.

45.     This scenario is exemplified in the current context. IQAir's mark is commercially strong and recognizable as a market leader, but the product of interest is infrequently purchased, and relatively expensive ($599 or more). Thus, a simple conceptual analysis based directly on articles cited by Dr. Neal suggests consumers are unlikely to have top-of-mind awareness for IQAir's mark. Consequently, the Eveready survey format is not appropriate. In addition, I understand from my web

---

[20] Swann (2016)

[21] Swann (2016)

DECLARATION OF SCOTT D. SWAIN

searches that the parties' products are sold proximately on at least Amazon.com and Walmart.com.

## V.   DR. NEAL'S OWN DATA CONFIRMS EVEREADY IS INAPPROPRIATE FOR THE PRESENT MATTER

46.   Examination of Dr. Neal's question wording, programming instructions, and empirical results reveals that Survey 1 was, in essence, a test of general unaided recall. Accordingly, the results of Survey 1 can be used to test the notion that IQAir's mark is not retained top-of-mind by the relevant universe of consumers. This test is probative because if IQAir is not top-of-mind for the relevant universe of air-purifier consumers, then even a properly conducted survey using the Dr. Neal's proposed Eveready format is not appropriate.

47.   In question Q15, respondents were first randomly assigned to view one of three marks (two versions of the disputed HEALTHPROTECT mark, plus a fictional "control" mark).

Q15

Please take your time to review the name below in connection with **air purifying units/air filters**.

**Test Cell 1:** HEALTHPROTECT [22 pt font, black Arial text, bold, all CAPS]

**Test Cell 2:** HealthProtect [dark thin blue font, H and P capitalized only]

**Control:** HEALTHASSURE [22 pt font, black Arial text, bold, all CAPS]

**[DO NOT ENABLE THE CONTINUE BUTTON UNTIL NAME HAS BEEN ON THE SCREEN FOR 10 SECONDS. SHOW FOLLOWING INSTRUCTION WHILE CONTINUE BUTTON IS DISABLED:** *You will be able to continue after at least 10 seconds have passed*. **AFTER 10 SECONDS ENABLE CONTINUE**

-19-

**BUTTON AND REPLACE THE ABOVE LINE WITH THE FOLLOWING INSTRUCTION AND OPTIONS:]**

Before continuing with the survey, please indicate whether or not you have viewed the name clearly.

**[SINGLE SELECT; RANDOMIZE]**

1. I viewed the name clearly

2. I am unable to view the name clearly **[TERMINATE; DO NOT COUNT AS COMPLETE]**

48.     Respondents were then informed in question Q16 that they would be asked a series of questions about the mark they were shown.

Q16.

On the next screens you will be asked some questions about the product you were just told about – namely, air purifying units/air filters with the following name:

**[PIPE TEST 1, TEST 2, OR CONTROL NAME BASED ON CONDITION]**

**[DO NOT ENABLE CONTINUE BUTTON UNTIL NAME HAS BEEN ON THE SCREEN FOR 5 SECONDS. SHOW FOLLOWING INSTRUCTION WHILE CONTINUE BUTTON IS DISABLED:]** *You will be able to continue after at least 5 seconds have passed*.

49.     In question Q17 of Survey 1, respondents commenced the first of four sets of questions intended to measure whether they confused the mark they were shown with any marks that exist in some representation in their mind. Q17 pertains to who the respondents think "makes or puts out" the mark they were shown.

Q17.  If you have an opinion, what company or brand, do you think makes or puts out air purifiers/air filters with the name you were just shown?

If you are thinking of more than one, please enter each one in a separate box below. If you don't know, please select that option.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW/NO OPINION" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW/NO OPINION, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY OR BRAND"]**

50.    However, the wording and layout of Q17 is such that it leads respondents to focus on listing top-of-mind companies or brands in the product category rather than reporting only those companies or brands associated with patterns of memory that are activated by exposure to the mark.

51.    In particular, the second line of instruction in Q17 creates "demand effects" by suggesting to respondents that researchers expect them to be, "…thinking of more than one…" company or brand.[22] This communicated expectation is reinforced by the presentation of five separate text boxes titled "Company or brand," which collectively signal that the task at hand is to produce any top-of-mind companies or brands. For each company or brand listed by a respondent, Q18 asked why they listed it.

52.    Question Q19 was a filter for whether respondents believed the mark they were shown has an "affiliation or connection" with other companies or brands.

Q19.

Do you think that the company or brand that makes/puts out air purifiers/air filters with the name you were shown...

**[RANDOMIZE FIRST TWO OPTIONS; SINGLE-SELECT]**

a.    Does have a business affiliation or connection with another company or brand

---

[22] Simonson (1994); Simonson and Kivetz (2012).

DECLARATION OF SCOTT D. SWAIN

b.  Does not have a business affiliation or connection with another company or brand

c.  Don't know/No opinion **[ANCHOR]**

53.  Question Q20 uses the same sort of wording and layout as Q17 and thus inherits the property of encouraging respondents to focus on listing top-of-mind companies or brands in the product category.

Q20.

What other company or brand do you believe has a business affiliation or connection with the company or brand that makes/puts out air purifiers/air filters with the name you were shown?

If you are thinking of more than one, please enter each one in a separate box below. If you don't know, please select that option.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY OR BRAND"]**

54.  Specifically, Q20 suggested to respondents that the researchers expect them to be, "…thinking of more than one…" connected or affiliated company or brand. As in Q17, this expectation is reinforced by the presentation of five separate text boxes titled "Company or brand." For each company or brand listed by a respondent, Q21 asked why they listed it.

55.  Questions Q22, Q23, and Q24 use the same structure as Q19, Q20, and Q21 except respondents were asked whether they think the mark they were shown needed "permission or approval" from other companies or brands. Question Q23 uses the same (leading) wording and five-box construction as Q17 and Q20.

Q23.

DECLARATION OF SCOTT D. SWAIN

What other company or brand do you believe the company or brand that makes/puts out air purifiers/air filters with the name you were shown needed to get permission or approval from?

If you are thinking of more than one, please enter each in a separate box below. If you don't know, please select that option.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY, OR BRAND"]**

**[SHOW Q24 IF RESPONDENT WROTE IN ANY BOX IN Q23]**

56.     Questions Q25, Q26, and Q27 use the same structure as Q22, Q23, and Q24, except respondents were asked whether they think the mark they were shown makes or puts out other air purifier/filer product lines or brands. Question Q26 uses the same (leading) wording and five-box construction as Q17, Q20, and Q23.

Q26.

What other names, product lines or brands of air purifiers/air filters do you think are made/put out by the company or brand that makes/puts out air purifiers/air filters with the name you were shown?

If you are thinking of more than one, please enter each in a separate box below. If you don't know, please select that option.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY OR BRAND"]**

57.     Dr. Neal computed confusion in all three cells by counting respondents who indicated that the mark they were shown was made/put out by, had a business affiliation or connection with, or needed to get permission or approval from IQAir.

DECLARATION OF SCOTT D. SWAIN

Net confusion was then computed by subtracting control-cell confusion from the confusion in each of the two test cells.

58.     The Survey 1 results confirm that, due to Dr. Neal's leading question wording and suggestive five-box construction, the majority of respondents merely listed top-of-mind companies, brands, or products, rather than supplying only those companies or brands associated with patterns of memory activated by exposure to Defendants' use. Another group of respondents appear to be either guessing, contrary to Dr. Neal's instructions, or were improperly qualified for the survey (consistent with my earlier critique of the survey screener questions). For example, respondents listed brands such as "Fitbit" and "Nature Bounty" (Respondent ID 14), which to my understanding do not manufacture air purifiers. Similarly, Respondent ID 64 answered "Samsung" for the stated reason that "They make everything[,] don't they[?]" Indeed, the sheer number of distinct names provided by respondents is implausibly large to cohere with the logic of the Eveready format. The Test Cell 1 stimulus (HEALTHPROTECT) yielded 76 unique names of brands, companies, and product lines. The Test Cell 2 stimulus (HealthProtect) yielded 63 unique names, and the Control stimulus (HEALTHASSURE) yielded 66 unique names. Across all three cells, respondents generated 144 unique names. The logic of the Eveready test is that when the respondent encounters a similar junior mark, the top-of-mind senior mark is triggered due to pattern recognition or matching. It is highly unlikely that each of Dr. Neal's stimuli is actually triggering over 60 distinct companies, brands, and product lines due to pattern recognition or matching within the relevant product category.

59.     Additionally, the companies, brands, and product lines purportedly triggered by Dr. Neal's stimuli exhibit tremendous dissimilarity from one another. This result contradicts the logic of the Eveready format. The distinct responses are not only exceedingly varied, but also constitute a long list of brand names that are

DECLARATION OF SCOTT D. SWAIN

hardly similar to each other, much less simultaneously similar to the single stimulus mark that purportedly brought them all to mind.

60.     The Survey 1 results confirm that IQAir's commercially strong mark did not exhibit top-of-mind awareness in the air-purifier category despite the fact that IQAir is widely recognized as an industry leader.[23] As noted in Table 23 of the Neal Report, only a handful of respondents listed IQAir, IQAir's marks, or IQAir's other product lines when asked the open-end Eveready questions. Consistent with the notion that the product category is infrequently shopped and relatively expensive, Dr. Neal's data find low top-of-mind awareness for IQAir, a key industry player. The names that achieved the greatest top-of-mind awareness were the experimental stimuli themselves, due to a large segment of respondents who simply parroted what they had just seen. Thus, the Eveready survey format is inappropriate and unreliable for assessing the likelihood of confusion between Defendants' mark and IQAir's mark.

## VI.   DR. NEAL'S SURVEY 2 (SQUIRT) USES INAPPROPRIATE CONTROL(S)

### A.   Overview of Survey 2

61.     Dr. Neal employed a "two-room" Squirt design for his Survey 2. In room 1 (question Q15), respondents were shown a screenshot of IQAir's product, presumably as it might appear in a consumer search of the Amazon.com website.

> Q15. Here is the air purifier. Please take as much time as you need to review it and then click continue when you are ready. The continue button will appear at the bottom of the page after 15 seconds. **[You can pinch two fingers to zoom in if you need to.]**

---

23 See Exhibit C for various air-purifier industry reports that recognize and report IQAir and Blueair as key competitors in the Global and U.S. air purification markets.

DECLARATION OF SCOTT D. SWAIN



IQAir [HealthPro Plus Air Purifier] Medical-Grade Air [HyperHEPA Filter] - Bacteria, Virus, Airborne Infections, Allergies, Pets, Asthma, Odors, Smoke, Pollen, Dust; Swiss Made

⭐⭐⭐⭐½ ~ 832

$899⁰⁰

✓prime FREE Delivery Fri, Aug 20

62.     In room 2 (question Q16), respondents were shown, purportedly in random order,[24] an array of purported competing products (including Defendants' product) as they might appear in an Amazon.com search result.

> Q16. Thank you. Below, you will see a number of other air purifiers that may also be available on Amazon.
>
> Please take as much time as you need to review them and then click continue when you are ready. The continue button will appear at the bottom of the page after 15 seconds. **[You can pinch two fingers to zoom in if you need to.]**

Blueair HealthProtect 7770i Smart Home Air Purifier for Viruses and Bacteria, Large room with HEPASilent Ultra Technology

⭐⭐⭐⭐½ ~ 152

$839⁹⁹

✓prime FREE Delivery Sun, Aug 15

---

24 There is no positive indication in the Neal Report that items in the room 2 arrays were randomized. Specifically, there appears to be no variable in the printed data (Neal Report, Exhibit C-2) that specifies which (random) ordering any of the respondents viewed. Because counsel for opposition refused to disclose the raw data files, I was unable to confirm whether such a variable exists in those files. Further, not only did counsel for opposition fail to turn over raw data files, their printouts of the data are incomplete and thus unreliable. I note that there are 10 replications of the Squirt question columns (Q17-Q25) in the printed data, with each replication containing responses from approximately 20-25 respondents. This may suggest that there were only 10 random orders assigned to respondents. For any set of five items, there are 120 possible orders.



63. Question Q17 is a filter question that identifies any respondents who believe room 2 contains one or more companies or brands that are "made/put out" by the company or brand whose mark they believe was displayed in room 1. These filtered respondents are shown question Q18 and asked which items in room 2 they were thinking about. For each item selected in Q18, the filtered respondents are presented with Q19, which asks why they selected the item.

Q17.

1    If you have an opinion, what do you believe about whether any of these

2    air purifiers are made/put out by the same company or brand that

3    makes/puts out the first air purifier we showed you?

4    **[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS**

5    **Q16]**

6

7



Air Health SKYE Portable 5 Stage Air Purifier | UV Light Sanitizer | PRO-Cell Technology | H13 HEPA Filter |
Pre-Filter | Carbon Filter | Smart Sensors | Auto Modes | Skye Mobile App
★★★★★ ~ 1
$649⁹⁹
✓prime FREE Delivery Tue, Aug 17

10    [SINGLE SELECT; RANDOMIZE EXCEPT ANCHORED]

11

12    1. None of these air purifiers are made/put out by the same company or

13    brand that makes/puts out the first air purifier I saw

14    2. One or more of these air purifiers are made/put out by the same

15    company or brand that makes/puts out the first air purifier I saw

16    3. I don't know/no opinion [ANCHOR]

17    **[SHOW Q18 IF Q17 = "ONE OR MORE...," OTHERWISE SKIP**

18    **TO Q20]**

19    Q18.

20    Which one or more of these air purifiers are made/put out by the same

21    company or brand that makes/puts out the first air purifier you saw?

22    Please click on all that apply.

23    **[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS**

24    **Q16-- INCLUDE CHECK BOXES]**

25    Q19.

26    For each air purifier shown below, please tell us why you believe that it

27    is made/put out by the same company or brand that makes/puts out the

28    first air purifier you saw.

DECLARATION OF SCOTT D. SWAIN

1   Please be as specific as possible – type your answer in the space

2   provided below the air purifier.

3   **[FOR Q19, PIPE IMAGE FOR EACH CHECKED AIR**

4   **PURIFIER FROM Q16 – INCLUDE MEDIUM-SIZED TEXT**

5   **BOX BELOW EACH PIPED IMAGE]**

6   64.   Question Q20 is a filter question that identifies any respondents who

7   believe room 2 contains one or more companies or brands that are "affiliated with or

8   sponsored by" the company or brand whose mark they believe was displayed in

9   room 1. These filtered respondents are shown question Q21 and asked which items

10   in room 2 they were thinking about. For each item selected in Q21, the filtered

11   respondents are presented with Q22, which asks why they selected the item.

12   Q20.

13   Do you believe one or more of these air purifiers are affiliated with, or

14   sponsored by, the company or brand that makes/puts out the first air

15   purifier you saw?

16   **[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS**

17   **Q16] [RANDOMIZE EXCEPT ANCHORED]**

18   1. None of these air purifiers are affiliated with or sponsored by the

19   same company or brand that makes/puts out the first air purifier I saw

20   2. One or more of these air purifiers are affiliated with or sponsored by

21   the same company or brand that makes/puts out the first air purifier I

22   saw

23   3. I don't know/no opinion **[ANCHOR]**

24   **[SHOW Q21 IF Q20 = "ONE OR MORE...," OTHERWISE SKIP**

25   **TO Q23]**

26   Q21.

27

28

DECLARATION OF SCOTT D. SWAIN

Which one or more of these air purifiers do you believe are affiliated with, or sponsored by, the company or brand that makes/puts out the first air purifier you saw?

Please click on all that apply.

**[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS Q16-- INCLUDE CHECK BOXES]**

Q22.

You said you believe that one or more of these air purifiers are affiliated with, or sponsored by, the company or brand that makes/puts out the first air purifier you saw. For each air purifier shown below, please tell us why you believe that.

Please be as specific as possible – type your answer in the space provided below the air purifier.

**[FOR Q22, PIPE IMAGE FOR EACH CHECKED PRODUCT FROM Q21 – INCLUDE MEDIUM-SIZED TEXT BOX BELOW EACH PIPED IMAGE]**

65.    Question Q23 is a filter question that identifies any respondents who believe room 2 contains one or more companies or brands who needed "permission or approval from" the company or brand whose mark they believe was displayed in room 1. These filtered respondents are shown question Q24 and asked which items in room 2 they were thinking about. For each item selected in Q24, the filtered respondents are presented with Q25, which asks why they selected the item.

Q23.

Do you believe one or more of these air purifiers needed permission or approval from the company or brand that makes/puts out the first air purifier you saw?

**[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS Q16] [RANDOMIZE EXCEPT ANCHORED]**

1. None of these air purifiers needed permission or approval from the company or brand that makes/puts out the first air purifier I saw.

2. One or more of these air purifiers needed permission or approval from the company or brand that makes/puts out the first air purifier I saw.

3. I don't know/no opinion **[ANCHOR]**

**[SHOW Q24 IF Q23 = "ONE OR MORE...," OTHERWISE SKIP TO Q26]**

Q24.

Which one or more of these air purifiers do you believe needed permission or approval from the company or brand that makes/puts out the first air purifier you saw? Please click on all that apply.

**[SHOW Q16 AIR PURIFIERS AGAIN IN SAME ORDER AS Q16-- INCLUDE CHECK BOXES]**

Q25.

You said you believe that one or more air purifiers needed permission or approval from the company or brand that makes/puts out the first air purifier you saw. For each air purifier shown below, please tell us why you believe that.

Please be as specific as possible – type your answer in the space provided below the air purifier.

**[FOR Q25, PIPE IMAGE FOR EACH CHECKED PRODUCT FROM Q24 – INCLUDE MEDIUM-SIZED TEXT BOX BELOW EACH PIPED IMAGE]**

**[FOR Q26, SHOW ADDITIONAL TEXT IN BOLD ONLY IF Q4=SMARTPHONE]**

B.   **Dr. Neal Failed to Justify his Simulation of Competitive Proximity or his Selection of Controls**

66.     Unlike the Eveready format, where respondents search memory for similarity or pattern-matching between an allegedly infringing junior use and any internally accessible information for a senior use, the Squirt format asks respondents to perform a similarity comparison between a junior use and an externally available senior use as it exists in the real world. Whereas the Eveready format depends on the ready accessibility of the senior mark in consumers' memory to facilitate similarity comparisons with junior use, the Squirt format depends on competitive or marketplace proximity to make the junior and senior uses readily accessible for similarity comparisons.

67.     Thus, the question of Squirt format appropriateness hinges on real-world competitive proximity. However, competitive proximity cannot be assumed simply because there is a possibility that the relevant universe would encounter a junior use and a senior use close in time and/or space. Rather, such an encounter should be common and predominant among the marketplace experiences of the relevant universe of prospective customers. For example, the fact that a junior and senior use exist on the internet does not, in itself, constitute competitive proximity.

68.     Competitive proximity is driven by marketplace reality, and Squirt survey designs must not only reflect junior and senior uses but also limit survey proximity to the sort that is commonly prompted by the product category at hand and the typical behaviors of the relevant universe of consumers who would search the category.

69.     Accordingly, it is incumbent on any researcher who conducts a Squirt format survey to demonstrate that a predominance of the relevant universe commonly searches for the underlying products or information in the simulated real-world context (e.g., online retail website), that the method of search for both products is carried out using a common method (e.g., uncontrived keywords and/or search result filtering), and that any competitive proximity occurs within normal

-32-

levels of effort and memory capacity. Dr. Neal provides no such information, citations, or opinions to support the construction of his room 2 array.

70.     Rather, Dr. Neal only states what he chose to do, saying, "I replicated an Amazon search for air purifiers that cost $599 or more in which respondents were first exposed to IQAir's IQAir HealthPro Plus air purifier and then, immediately thereafter, exposed them to Defendants' Blueair HealthProtect air purifier and four other (unaccused) control products."[25]

71.     Dr. Neal goes on to say, "After reviewing Plaintiffs' IQAir HealthPro for a minimum of 15 seconds, respondents were immediately exposed, in randomized order, to Defendants' Blueair HealthProtect air purifier plus four other air purifiers generated in the same Amazon search. These four products served as controls (i.e., comparable products generated by the same search in the same marketplace that are not alleged to cause trademark confusion with Plaintiffs)."[26]

72.     Thus, we are left to guess the specific method by which Dr. Neal selected his controls. We are also left to guess whether this method even remotely resembles the approach taken by any consumers in the relevant universe. This renders Dr. Neal's Squirt controls unreliable. Further, even if one were to deem Dr. Neal's controls to be the result of an acceptable method for simulating proximity, it is clearly the case that the controls are nevertheless arbitrary because Dr. Neal's unknown approach, whatever it may be, could constitute only one of many similarly acceptable approaches. Even small variations of Dr. Neal's approach would likely produce different sets and orderings of available control products. Thus, Dr. Neal's controls can be classified as an arbitrary selection from among the possibilities in the real-world marketplace.

---

25 Neal Report, ¶ 2.4.

26 Neal Report, ¶ 2.6.

DECLARATION OF SCOTT D. SWAIN

73.     The unreliability and arbitrariness of Dr. Neal's approach to identifying controls is particularly critical in this matter because Dr. Neal relied on an "in-treatment" method of calculation for net confusion. That is, he selected one of the four controls in his room 2 array to serve as a singular control (conveniently, the one that most benefitted Blue Air, *see infra* ¶¶ 81-83) for the purposes of calculating net confusion. Yet, the controls appearing in Dr. Neal's room 2 array are, at best, a random selection of the controls that could have (or should have) appeared in the array. Again, with no evidence or justification for assuming that his approach to simulating proximity is anything other than uncommon, contrived, or artificial, Dr. Neal's calculated net confusion is unreliable as an estimate of the real-world likelihood of confusion in this matter.

**C.     Dr. Neal's Controls Fail to Isolate the Effect of the Disputed Mark**

74.     A well-known weakness of the two-room Squirt format is that it encourages respondents to look for a potential commonality between the parties such that respondents tend to gravitate to easily evaluated bases of comparison that they otherwise would not in the real world. Thus, extraneous, non-trademark-related elements that are not at issue can drive (non)confusion in a Squirt design, leaving the effects of the element at issue unknown.

75.     These kinds of extraneous, non-trademark-related elements are referred to as survey "noise" or sources of "false positives/negatives" and must be controlled for by the survey methodology. In the context of the two-room Squirt format, survey noise is typically controlled by exposing respondents to one or more non-infringing products in the category and assuming that the extent to which these products register as confusing is a measure of the baseline confusion or "noise" present in the estimated confusion level for the tested (disputed) product.

76.     Indeed, without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is substantial or merely reflects guessing, response errors, extraneous factors, and/or the flaws of the survey methodology.

DECLARATION OF SCOTT D. SWAIN

77.     In her highly regarded reference guide for survey research, Dr. Shari Seidman Diamond explains that the general principle for a control is that it, "…should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[27] In the two-room Squirt format, the experimental stimulus would be the product that appears in room 1 (the senior use). A survey control that involves changing multiple relevant components does not effectively serve this function. Instead, a good control (a) shares features with the allegedly infringing mark – other than those alleged to be infringing, (b) does not contain cues that would artificially inflate or suppress confusion responses by leading respondents in a particular direction, (c) is a commercially plausible member of the product category, and (d) is not itself infringing.

78.     Dr. Neal's room 2 controls fail to meet Dr. Diamond's general principle because they differ from the room 1 stimulus in salient but uncontested ways. For example, the controls all differ from the tested product in terms of the product images and configurations. Respondents who are searching for a connection due to the suggestiveness of the two-room Squirt survey format are likely to quickly and easily notice that the products vary in trade-dress appearance and similarity with respect to the room 1 product. This leads respondents to unduly focus their similarity assessment on product appearance (rather than solely on the contested mark element), potentially in a manner that would never occur in the real world, where consumers are not artificially led to make similarity assessments.

79.     For example, the GOCHEER control (selected by Dr. Neal for computing net confusion) may be perceived as having a trade dress that is more visually similar to the HEALTHPRO trade dress than the other controls due to being the only item that shares the rectangular, symmetric shape with a vertical band of

---

27 Diamond (2011), p. 399.

bisecting color. Verbatim responses concerning the reasons for selecting GOCHEER include answers such as "looks identical" (Respondent ID 115), "[i]t has the most similar design . . ." (Respondent ID 2), and "[b]ecause they have a similar design" (Respondent ID 17).   In fact, of the respondents who selected GOCHEER, only 4% mentioned "name" when explaining their choice whereas more than 20% mentioned similarity or identicality of "design/looks."  With this analysis, the GOCHEER control was selected by respondents more often than any of the three remaining controls.

80.     Confusion for Dr. Neal's Preferred Control in Survey 2 is Inflated Because of Dr. Neal's failure to filter out – control for – trade-dress noise, he has no way of knowing what the true net trademark-confusion level is. It is possible that had he accounted for irrelevant trade-dress confusion, Dr. Neal would have found that net confusion is closer to 43.1% than his estimated value of 7.8%.

81.     In explaining how he computed net confusion, Dr. Neals states that, "Consistent with standard practice in Squirt surveys, the control product with the highest confusion rate serves this function because it provides a baseline measure of confusion between products that clearly is not caused by trademark confusion."[28] In a footnote reference for this statement, Dr. Neal cites a 2012 book chapter on the design of likelihood of confusion surveys.[29]

82.     Based on my experience, Dr. Neal's so-called "standard practice" is anything but. I have seen many two-room Squirt studies conducted for litigation, and none has used Dr. Neal's approach. Even the book chapter that Dr. Neal cites does not appear to offer any opinion as to selecting a singular control from among multiple controls for the purposes of computing net confusion.

---

28 Neal Report, ¶ 2.12.

29 Swann (2012).

DECLARATION OF SCOTT D. SWAIN

83.     In my opinion, if one overlooks the many flaws in Dr. Neals, survey design and accepts his controls as reliable and non-arbitrary, a more sensible, conservative, and fair approach would be to use the control with the lowest rate of confusion for the purposes of computing confusion. Using this approach, Table 1 of the Neal Report reveals a net confusion of 14.7% (88/204 minus 58/204). Alternatively, one might avoid the issue of which control to select by averaging the confusion found across all controls. Using this approach, Table 1 of the Neal Report reveals a net confusion of 12.0% (88/204-(59/204+65/204+58/204+72/204)/4). It is my understanding that prior cases in this district and elsewhere have found infringement based on similar (and lower) levels of net confusion.[30]

84.     Further illustrating the impropriety of Dr. Neal's calculations based on the GOCHEER control product is the problem of "spotlighting".  When using the two-room Squirt survey, researchers must take care to avoid cueing or signaling to respondents that particular items in room 2 are the focus of the study. The reason is

---

30 CSC Brands LP v. Herdez Corp., 191 F. Supp. 2d 1145, 1151–52 (E.D. Cal. 2001) (15%). Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 594 (3d Cir. 2002) ("15% confusion is sufficient to demonstrate actual confusion"). Borghese Trademarks Inc. v. Borghese, 2013 WL 143807 (S.D. N.Y. 2013) (15% level of net confusion was "probative of consumer confusion). Newport Pac. Corp. v. Moe's Sw. Grill, LLC, 2006 WL 2811905, at *14 (D. Or. Sept. 28, 2006) (finding 14% sufficient to favor plaintiffs, "[e]ven though the percentage is barely over McCarthy's [10%] threshold, and is the subject of attack by defendants' expert"). Hansen Beverage Co. v. Cytosport, Inc., 2009 WL 5104260, at *16 (C.D. Cal. Nov. 4, 2009) (finding 12.5% net confusion rate sufficient to weigh this Sleekcraft factor in favor of the plaintiff, albeit not independently sufficient to support of a finding of likelihood of confusion). Jockey International, Inc. v. Burkard, 185 U.S.P.Q. 201, 1975 WL 21128 (S.D. Cal. 1975) (11.4%). McDonough Power Equipment, Inc. v. Weed Eater, Inc., 208 U.S.P.Q. 676, 1981 WL 40435 (T.T.A.B. 1981) (11%). Mutual of Omaha v. Novak, 836 F.2d 397, 400 (8th Cir. 1987) (10-12%). Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 365 F. Supp. 707, 180 U.S.P.Q. 506 (S.D.N.Y. 1973), modified, 523 F.2d 1331, 186 U.S.P.Q. 436 (2d Cir. 1975) (8.5% confusion is "strong evidence" of a likelihood of confusion)

---

that when respondents think they have figured out or spotted the purpose of a study, they often align their behavior with what they think the researchers deem to be the "correct" behavior (e.g., selecting a certain response).[31]

85.     While introducing multiple controls (or multiple decoys, in the case of an external control) ostensibly helps to remove the "spotlight" from individual items in room 2, researchers sometimes inadvertently undermine this design protection. Dr. Neal's Survey 2 provides a textbook example of such spotlighting.

86.     Specifically, the GOCHEER control not only has the lowest price and the highest rating from the most consumers (5-star average among 270 reviewers) among all controls, but it also features a bright green, highlighted promotional coupon labelled, "Save $50.00." In fact, nearly 14% of respondents who selected GOCHEER mentioned the pricing or coupon as the reason. One wrote, for instance, that the "[p]rice stood out and coupon was listed . . .," (Respondent ID 1), and another wrote "[c]ause its on sale" (Respondent ID 210). From the respondent point of view, GOCHEER stands out not only because its trade dress may most closely resemble the room 1 stimulus but also because it is the "best," "cheapest," and "most featured" product in the lineup. Any or all of these factors serve to artificially and substantially inflate the rate at which the GOCHEER product would be selected by respondents as the "right answer" to the researcher's questions. In my opinion, this further renders the GOCHEER confusion estimate unreliable, artificially depressing the overall net confusion level.



Blueair HealthProtect 7770i Smart Home Air Purifier for Viruses and Bacteria, Large room with HEPASilent Ultra Technology
★★★★☆ · 152
$839.99
✓prime FREE Delivery Sun, Aug 15

---

31 Simonson (1994); Simonson and Kivetz (2012).



aeris aair Gas PRO Air Purifier - Zeolite and Charcoal Filter - Eliminates Toxic Gases and Odors from Large Rooms - No Harmful Ozone or UV - Quiet/ Low Noise - Wi-Fi Connectivity - White
$1,299.00
FREE Delivery for Prime members
Only 1 left in stock - order soon.



Alen BreatheSmart 75i Large Room Air Purifier, Medical Grade Filtration H13 True HEPA for 1300 Sqft, 99.99% Airborne Particle Removal, Captures Allergens, Bacteria, Mold, Smoke, in White
★★★★½ ~535
$759.00
✓prime FREE One-Day
Get it Tomorrow, Aug 15



Air Health SKYE Portable 5 Stage Air Purifier | UV Light Sanitizer | PRO-Cell Technology | H13 HEPA Filter | Pre-Filter | Carbon Filter | Smart Sensors | Auto Modes | Skye Mobile App
★★★★★ ~1
$649.99
✓prime FREE Delivery Tue, Aug 17

Gocheer Air Purifier for Large Room CADR 1,000 Covers 2,500 Sq ft Dual Drive 4-in-1 H13 True HEPA Filters Smart Air Cleaner for Home Eliminate Smoke Dust Pollen Mold Pet Dander Allergens Gases
★★★★★ ~270
$599.99
Save $50.00 with coupon
✓prime FREE Delivery Mon, Aug 16

## VII.  CONCLUSIONS

87.     Based on my experience as a researcher, educator, and business consultant, and having conducted, supervised, and evaluated well over 1,000 marketing research studies, it is my professional opinion that Dr. Neal's surveys (Survey 1 and Survey 2) are flawed in multiple respects.

88.     First, Dr. Neal's universe is deeply compromised, if not completely compromised, because he failed to properly specify the relevant demographics, failed to screen for yea-saying in past purchases and future purchase intentions,

DECLARATION OF SCOTT D. SWAIN

failed to exclude consumers who are not in the market, failed to exclude professional survey takers, and failed to exclude non-compliant respondents.

89.     Second, Dr. Neal's Survey 1 does not measure likelihood of confusion because the Eveready format used is flawed and inappropriate for the present matter. The results of Survey 1 empirically confirm that Eveready is inappropriate for the present matter.

90.     Third, Dr. Neal's Survey 2 (Squirt) uses inappropriate control(s). He not only failed to justify his simulation of competitive proximity or his selection of controls, but the controls themselves fail to isolate the effect of the disputed mark. Additionally, Dr. Neal's decision to use the control with the highest confusion level is arbitrary and specious and invalidated by an unreliable estimate of the control rate of confusion, which  artificially depresses true net confusion.


I reserve the right to amend or revise this declaration in response to additional information, documents, or testimony provided by the parties, which may be brought to my attention after the date of my signature below.

This report is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without prior written consent from Dr. Scott D. Swain.

DATED:  September 10, 2021

_____

Scott D. Swain, Ph.D.

-40-